IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION


SECURITIES AND EXCHANGE COMMISSION                    PLAINTIFF

VS.                          CIVIL ACTION NO. 5:08-cv-245(DCB)(JMR)

U.S. SUSTAINABLE ENERGY CORP.
AND JOHN H. RIVERA                                    DEFENDANTS

ALICE M. PRICE                                  RELIEF DEFENDANT


<u>MEMORANDUM OPINION AND ORDER</u>

This cause is before the Court on the plaintiff Securities and Exchange Commission ("the Commission")'s motion for summary judgment **(docket entry 61).** Having carefully considered the motion and the defendants' response, the parties' memoranda and the applicable law, and being fully advised in the premises, the Court finds as follows:

In this case, the Commission claims that defendant John H. Rivera ("Rivera") used false press releases and other false public statements to "pump up" interest in U.S. Sustainable Energy Corp. ("USSE") stock in order to "dump" insider shares (that Rivera, relief defendant Alice M. Price ("Price") and others held) into a public market fraudulently influenced by Rivera's false statements. The Complaint further alleges that after obtaining a corporate shell with freely trading shares in October of 2006, Rivera, through USSE, falsely claimed that USSE could employ "the Rivera Process" to produce commercial products, revenue and value for the Company.   According   to   the   Commission,   these   and   other

misstatements by Rivera created investor demand for USSE shares. Rivera, Price and others purportedly sold millions of USSE shares to thousands of investors lured by Rivera's false claims about the company.

The central fraud alleged involves claims by Rivera that USSE could produce viable commercial biofuel and fertilizer products. The Commission contends that false press releases dramatically increased the price and volume of trading in USSE's shares. The "Rivera Process" is a type of pyrolysis, the thermochemical decomposition of organic material at elevated temperatures in the absence of oxygen. Experts agree that experiments with pyrolysis hold promise of developing useful and cost effective technologies to extract energy from abundant forms of organic waste like woodchips, palm oil waste or other organic waste, regardless of whether accomplished by the "Rivera Process" or otherwise.[1] The Commission asserts that its case is not about whether a pyrolytic process like Rivera's might someday be successful, but about whether Rivera's claims that USSE had perfected the "Rivera Process" in any commercially meaningful way were false. The Commission contends that there is no genuine issue of material fact disputing the falsity of Rivera's alleged misrepresentations.

Defendant USSE began as a Mississippi corporation formed by

---

[1] See Report of plaintiff's expert, Dr. Thomas Adams, Item 21 attached to Statement of Undisputed Material Facts in Support of Plaintiff's Motion for Summary Judgment.

Rivera in February 2006. Subsequently, it merged itself into a Nevada corporation with freely trading public shares and changed that corporation's name to USSE in November 2006. USSE was initially headquartered in Natchez, Mississippi, and later moved its headquarters to Baytown, Texas. USSE's stock was not registered with the Commission. Rivera's press releases and other statements to investors, USSE's website and postings on various penny stock blogs were the only public information available about the company.

Defendant Rivera is the founder of USSE. Rivera was the principal shareholder of USSE and controlled its activities. He also served as USSE's chairman and CEO.

Relief Defendant Price resides with Rivera and is his caregiver. Price sold more than 35 million combined shares of USSE (15,837,740 shares) and Sustainable Power Corporation ("SSTP")[2] (19,669,000 shares) and allegedly used the more than $2 million proceeds to fund her lifestyle with Rivera and the activities of USSE. Rivera and Price were married in August of 2010.

The crux of the Commission's case is set forth in its brief in support of its motion for summary judgment (the bracketed references are to the plaintiff's Statement of Undisputed Material Facts in Support of Plaintiff's Motion for Summary Judgment):

---

[2]Rivera was also the principal shareholder of SSTP. According to the Commission, Rivera used SSTP for misconduct similar to that alleged in this case.

At the heart of this case is Rivera's fraudulent claim that USSE, using the Rivera Process [¶¶ 21-33], had a fully operational plant that produced commercial biofuels and fertilizer that could be sold to generate revenue for the company. Rivera made false claims about various aspects of the Rivera Process: (a) that USSE had a fully operational plant; [¶¶ 44-46, 52-63] (b) that the process could produce 5 gallons of biofuel from one bushel of soybeans; [¶¶ 47-51 ] (c) that USSE could produce 6,000 gallons of fuel per day; [¶¶ 52-63, 103, 107] and (d) that USSE could produce quality fuel for 50 cents per gallon. [Facts, ¶¶'s 99-104]

Rivera also made misrepresentations about USSE on a variety of other topics: (a) that USSE had engaged a prominent investment banker when it had not; [¶¶ 64-67] (b) that USSE had appointed a prominent industry figure as a new director when the new director had not heard about USSE until after the publication of the press release [¶¶ 68-71], and had later appointed a new CEO who lasted for two weeks because he had no authority; [¶¶ 73-4] (c) that USSE had purchased property for its manufacturing facility in Natchez, Mississippi when the property was purchased by another entity; [¶¶ 75-77] (d) that it made the first sale of its fertilizer although no fertilizer was shipped for more than two years; [¶¶ 111-115] and (e) that it had developed ASTM certified biodiesel when in fact no USSE fuel was included in the biodiesel Rivera touted in the July 17, 2007 press release. [Facts, ¶¶'s 116-126]

Brief in Support of Motion for Summary Judgment, pp. 4-5.

On July 17, 2008, the Commission filed its Complaint alleging that USSE and Rivera violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.  The Complaint seeks permanent injunctions against future violations; disgorgement of ill-gotten gains plus prejudgment interest; imposition of civil penalties against USSE and Rivera; and penny stock and officer and director bars against Rivera.  The Commission's Complaint also names Price as a relief defendant, and seeks disgorgement of her ill-gotten gains plus

prejudgment interest.  The plaintiff states that it has provided its entire investigative file to the defendants, and has updated its production as it has received new materials.  The plaintiff has taken 10 depositions, and has timely produced its expert's report. Rivera and Price have conducted no discovery.  USSE is unrepresented and is alleged by the Commission to be out of business.

The Commission seeks summary judgment on all of its claims. Summary judgment is appropriate when the pleadings and record evidence show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law.  Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994).  The movant bears the burden of proving that no genuine issue of material fact exists.  Latimer v. Smithkline & French Lab., 919 F.2d 301, 303 (5th Cir. 1990).  The Court should grant summary judgment if the moving party establishes there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Carlin Commc'n, Inc. v. S. Bell Tel. Co., 802 F.2d 1352, 1356 (11th Cir. 1986).  As recognized in Celotex, the "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" 477 U.S. at 327.

5

Rule 56(e) provides that the non-moving party "may not rest upon the mere allegations or denials of the adverse party's pleading," but instead must come forward with "specific facts showing that there is a genuine issue for trial." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986). Indeed, the Supreme Court directs that "the trial judge must [enter summary judgment] if, under the governing law, there can be but one reasonable conclusion." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); see also Matsushita, 475 U.S. at 587 ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is 'no genuine issue for trial.'") (citation omitted).

The Commission maintains that the undisputed evidence in this case shows that Rivera intentionally defrauded investors by claiming that USSE's machine was fully operational and ready to generate income for the company, when in fact the USSE equipment using the "Rivera Process" was still under development and not fully operational; and that Rivera's continuing string of press releases, many of which contained these and other misrepresentations, were material in creating a market for USSE shares into which Rivera, Price and others sold millions of shares. Specifically, the Commission alleges that the defendants made the following claims about the "Rivera Process" (the bracketed references are to the plaintiff's Statement of Undisputed Material

6

Facts):

1.  That USSE's Equipment Was Fully Operational

There is no dispute that USSE, at best, had an experimental reactor still in development that was not ready for full scale production. [¶¶ 30, 45-6, 59, 60-3, 104, 107] The longest it ever ran continuously was four or five days. [¶ 59] It did not produce any fuel that could be sold and it never generated any revenue for USSE. [¶ 54]

2.  That USSE Could Make 5 Gallons of Fuel From One Bushel of Soybeans

In press releases dated October 26, 2006 and January 17, 2007, Rivera falsely claimed that USSE's reactor could produce five gallons of quality fuel from one bushel of soybeans. [¶¶ 42, 52] The five gallon per gallon statement is indisputably inflated because in an hour the machine produced barely five gallons of liquid which contained significant amounts of water. [¶¶ 47-8] When the water was distilled off of the raw output, as it had to be to run anything, the remainder was materially less than five gallons. [¶ 49 ("after the water was removed 3 gallons of fuel would remain")] In some tests, the amount of water was above 25%. [¶ 50]

3.  That USSE Could Produce 6,000 Gallons of Fuel Per Day

In the January 17 [2007] press release, Rivera also falsely claimed that USSE's reactor could produce 6,000 gallons of biofuel daily.  This statement was false.  By the most generous estimate, USSE's machine could produce only half of its promised production. [¶ 60, 103-8] In actual test observations, it might produce 2,400 gallons per day. [Id.] At least one observation showed that the machine only generated 880 gallons in 24 hours. [¶ 54] One reason that the reactor failed to meet this production goal was that the reactor could process only half or less of the amount of soybeans needed to generate this production goal in one 24 hour period. [¶¶ 61-3, 103-5] The other reason, of course, was the fact that the reactor only ran four or five days in continuous operation on one occasion. [Facts, ¶ 59]

4.  That USSE Could Produce Fuel for Fifty Cents Per Gallon

Rivera made the claim that the USSE reactor could produce fuel for $.50 per gallon in the "About U.S. Sustainable Energy Corp." section which appeared near the bottom of most USSE press releases.  There is no genuine issue that this claim was false.  Rivera's "back of the envelope" calculations that resulted in the 50 cent per gallon number ignored equipment and production costs, [¶¶ 99-100], ignored the fact that the machine could at best produce only half of its projected output, [¶¶ 59-63] and depended on the illusory claim that the USSE fuel would qualify for some ill-defined $1 per gallon credit. [¶¶ 10,103]  In fact, USSE never produced anything that actually qualified for any credit. [¶ 127]

Brief in Support of Motion for Summary Judgment, pp. 7-8.  In addition, the Commission alleges that the defendants made additional false claims about USSE's business prospects that fraudulently influenced investors to purchase its shares:

1.  False Claim to Have Engaged Investment Bank

On November 16, 2006, soon after its shares began trading, Rivera published a press release announcing that it had engaged a prominent investment bank. [¶ 64] Rivera based the press release on a draft contract he received from the investment bank. [¶ 65] Five days later, Rivera retracted the statement.  The retraction admits that the earlier press release was false. [¶ 66] At this early stage of USSE's public trading, the regular publication of optimistic press releases likely outweighs the impact of a retraction after the fact.  Indeed, Rivera announced that it was working with a different investment bank the morning before the retraction was published. [¶ 67]

2.  False Claims about Appointing New Board Member and New CEO

Again, early in USSE's public trading, Rivera published a press release announcing that a prominent industry figure had joined USSE's board of directors. [¶ 68] There is no doubt that the press release was false.  The industry figure had never heard of USSE until he learned about the press release several days after it was published and he never agreed to serve as a director of

USSE. [¶¶ 69, 72] When he learned about the press
release, he sent Rivera a letter asking that the press
release be retracted, but it never was. [¶¶ 70-71]

USSE also published a press release in May 2007
announcing the appointment of an experienced scientist as
CEO of the company. [¶ 73] This press release was also
misleading. In fact, Rivera never relinquished any
control over the company to the "new" CEO and the "new"
CEO left after less than two weeks when he realized that
Rivera would not let him exercise any real control. [¶
74]

3.  False Claim to Have Purchased Natchez Property

On December 12, 2006, Rivera wrote a USSE press release
that announced that USSE had purchased a 35-acre property
in Natchez as its new manufacturing facility through its
affiliated real estate holding company. [¶¶ 74, 77] In
fact, USSE did not own the real estate holding company
that bought the property and did not purchase the
property. [¶ 66]

4.  False Disclosures to and about Diversified Ethanol

In December 2006, Taylor Moffitt and others from
Diversified Ethanol, Inc., a division of Originally New
York, Inc. ("ONYI"), a reporting company, visited USSE's
plants in Port Gibson and Natchez. [¶ 78] Diversified
Ethanol owned an ethanol plant. [¶ 79b] During the visit,
Rivera made a variety of false claims to Moffitt: that
Rivera owned the land across the river from his plant in
Natchez and owned a pipeline that went across the river,
that USSE's reactor was fully operational and that the
Air Force was taking all he had to sell, that the reactor
could produce 6,000 gallons of fuel per day and that he
had received two offers to buy his technology for nine
and twelve billion dollars. [¶¶ 79-81] A few days later,
Rivera and others visited Diversified Ethanol's
facilities in Eagle Grove, Iowa. [¶ 82]

Rivera sought to merge USSE with ONYI and on December 22,
2006, he signed a Memorandum of Understanding with ONYI
to merge the two companies into ONYI with Rivera in
control of the resulting company. [¶¶ 83-85] The
Memorandum of Understanding Rivera signed with ONYI
falsely claimed that USSE had patented technology. [¶ 86]
USSE did not own patented technology but only licensed

Rivera's patent pending technology at Rivera's will. [¶¶ 22, 87] Rivera also caused Diversified Ethanol to issue a January 4, 2007 press release that falsely claimed, among other things, that the combined business were worth 9 to 12 billion dollars. [¶¶ 88, 91-95] This was false since USSE had nothing to sell. [¶¶ 80, 92] On January 5, 2007, USSE published a similar press release that claimed that the combined companies would save 30-35% on their energy costs making their product the most cost-effective ethanol anywhere.  This statement was false because it incorrectly assumed that the energy supplied by USSE would be free. [¶ 98]

5.  False Claim to Have Sold Fertilizer

On April 3, 2007, USSE announced that it had made its initial sale of a ton of its fertilizer at 15 cents per pound, purportedly generating the first revenue ($300) for the company. [¶¶ 111-2] In fact, no fertilizer was shipped or delivered to the "purchaser" until June 2009. Even then, only 1,700 pounds of fertilizer was delivered and the purchaser never paid for it. [¶¶ 113-5]

6.  False Claim to Have Produced Certified Biofuel

On July 17, 2007, USSE announced that it had developed a revolutionary new biodiesel that was certified for commercial use and would begin shipment in 72 hours. [¶ 116] The claim was false.  Rivera knew that the revolutionary biofuel had been created in gallon buckets and contained none of USSE's purported fuels. [¶¶ 118-22] Plainly, the fuel could not begin shipment in 72 hours. [¶¶ 118, 122]

Brief in Support of Motion for Summary Judgment, pp. 8-11.

To prove violations of Section 10(b) of the Exchange Act and Rule 10b-5, the Commission must establish that the defendants acted with scienter.  Aaron v. S.E.C., 446 U.S. 680 (1980).  Scienter is the "mental state embracing intent to deceive, manipulate or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 (1976). Scienter may be established by showing intentional or severely

reckless conduct.  Broad v. Rockwell Int'l Corp., 642 F.2d 929, 961-62 (5th Cir. 1981); S.E.C. v. Kornman, 391 F.Supp.2d 477, 493 (N.D. Tex. 2005).  Severe recklessness is (1) an extreme departure from the standards of ordinary care, and (2) a present danger of misleading buyers or sellers of securities that is either known to the defendant or is so obvious that the defendant must have been aware of it.  Shushany v. Allwaste, Inc., 992 F.2d 517, 521 (5th Cir. 1993).

In support of its motion for summary judgment on the issue of scienter, the Commission asserts that Rivera knew that USSE's reactor was not ready for commercial operation.  Gerald F. Brent ("Brent") worked for Rivera from at least 2001 and served as general manager of the mechanics and laborers involved in constructing, operating and maintaining the equipment used to carry out the "Rivera Process" from its early development in Port Gibson, Mississippi, through June of 2009.  Brent testified that the longest the machine had run continuously was for a period of four or five days.  [¶ 59].[3]  Rivera admitted that they only had storage capacity of "between 4 and 6,000 gallons," not enough capacity to store Rivera's claimed commercial production of 6,000 gallons per day.  [¶ 108].  Rivera also knew that his fuels had not complied with any ASTM standard and, without doing so, could not be sold

---

[3] Bracketed references are to the plaintiff's Statement of Undisputed Material Facts.

commercially.  [¶¶ 43, 124, 127].  Rivera also knew that fuels from
the "Rivera Process" had to be distilled before being used but
nonetheless told Moffitt that the fuel was only filtered before it
was used in lawn mowers and other equipment in demonstrations.  [¶¶
79, 106 (raw fuel must be distilled), 130 (Rivera agreed that raw
fuel would not run a diesel engine)].  Rivera also signed a
memorandum of understanding with ONYI that falsely claimed USSE had
patented technology.  [¶¶ 86-87].

     The plaintiff also shows that Rivera acted with scienter in
making other misrepresentations.  There is no dispute that Rivera
knew the November 16 press release announcing the purported
engagement of a prominent investment bank was false.  He retracted
it five days later.  [¶¶ 64-66].  The announcement that Dr. David
Crow had been appointed to USSE's board was simply made up.  Crow
knew nothing about USSE until after the press release was
published.  When he was told about the press release, he sent a
letter demanding a retraction.  [¶¶ 68-72].  Rivera knew that USSE
did not sell fertilizer in April of 2007.  No shipment was made to
the purported purchaser until June of 2009, and USSE did not have
fertilizer to ship in April 2007.  [¶¶ 111-115].  In addition,
Rivera's scienter is imputed to USSE because Rivera controlled the
company.  See S.E.C. v. Manor Nursing Ctrs., Inc., 458 F.2d 1082,
1097 n.18 (2nd Cir. 1972).

     Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and

12

Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, prohibit fraudulent conduct in connection with the purchase and sale of securities.  To prove violations based on misrepresentations or omissions, the Commission must show that the misrepresentations or omissions were material.  S.E.C. v. Texas Gulf Sulphur Co., 401 F.2d 833 (2nd Cir. 1968).  A misrepresentation or omission is material if there is a substantial likelihood that under all circumstances it would have assumed actual significance in the deliberations of a reasonable investor.  Basic, Inc. v. Levinson, 485 U.S. 224 (1988); TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438 (1976).

The plaintiff shows that the misrepresentations Rivera made through USSE were material.  False statements from senior management impugn the integrity of management and are material.  In re Monster Worldwide, Inc. Securities Litigation, 251 F.R.D. 132, 138 (S.D. N.Y. 2008); Novak v. Kasaks, 216 F.3d 300, 312 (2nd Cir. 2000); S.E.C. v. v. Joseph Schlitz Brewing Co., 452 F.Supp. 824, 830 (E.D. Wisc. 1978).  The misrepresentation that USSE had developed a fully operational machine ready for commercial production to produce revenue goes to the fundamental value of USSE shares and was significant to a reasonable investor trying to decide whether to invest in the company.  Information concerning a company's financial condition is generally considered material.  S.E.C. v. Murphy, 626 F.2d 633, 653 (9th Cir. 1980).  Similarly, Rivera's representations about the capability of the USSE machine

employing the "Rivera Process" to produce 6,000 gallons of fuel per day, to convert one bushel of soybeans into five gallons of fuel, and to produce for 50 cents per gallon, all support the core misrepresentation that USSE was ready for commercial production. The knowledge that USSE had nothing to sell and no prospect of immediate revenue was withheld from investors and was also material. See S.E.C. v. Platforms Wireless Intern. Corp., 617 F.3d 1072, 1092 (9th Cir. 2010)("An omitted fact is material 'if there is a substantial likelihood that disclosure of the omitted fact would have been viewed by a reasonable investor as having significantly altered the total mix of information available.'") (quoting S.E.C. v. Phan, 500 F.3d 895, 907-08 (9th Cir. 2007)).

The Commission also shows that other misrepresentations by Rivera materially altered the mix of information available to investors.  False press releases announcing the engagement of a prominent investment banker (November 16, 2006) [¶¶ 64-66], the appointment of a prominent industry figure to USSE's board (November 15, 2006) [¶¶ 64-72], the purchase of a manufacturing property (December 12, 2006) [¶¶ 75-77], the merger with Diversified Ethanol (January 4 & 5, 2007) [¶¶ 78-110], the announcements of the first official reactor (January 17, 2007) [¶¶ 52-63] and the first sale of fertilizer (April 3, 2007) [¶¶ 111-115], all continued to keep investors interested in purchasing USSE shares.  The continuing stream of USSE press releases that Rivera

14

produced from October of 2006 through at least July of 2007, many of which were false, influenced the trading in USSE shares.  The USSE price/volume chart from Bloomberg for the period from October 2006 through July 2008, attached as Item 3 to the plaintiff's Statement of Undisputed Material Facts, shows that although USSE's stock price steadily declined, millions of shares were traded by thousands of investors sufficiently interested in USSE to keep buying its shares.

In their response to the plaintiff's motion for summary judgment, defendant Rivera and relief defendant Price fail to contradict the Commission's evidence of the core misrepresentations that misled investors.

Federal Rule of Civil Procedure 56(e) requires that affidavits and oppositions to a summary judgment motion must be based upon admissible evidence (Fed.R.Civ.P. 56(e)(1)), and on supporting facts (not mere allegations) showing a genuine issue for trial. Fed.R.Civ.P. 56(e)(2).  Defendant Rivera has failed to offer admissible evidence creating a genuine issue of material fact. Most of the materials filed with the response are unauthenticated. Fed.R.Evi. 901(a) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Most of the materials filed with the response fail to meet this

15

basic test.   The response provides no affidavits, testimony or other materials to establish that the documents filed with the response are what they purport to be.  As a consequence, they are inadmissible and cannot create a genuine issue of material fact.  In addition, most if not all of the filings fail to meet the requirement of relevancy set forth in Fed.R.Evi. 401: "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'"

The bulk of the filings accompanying the defendants' response bear on the likelihood that the "Rivera Process" has potential for producing useful products, instead of the central misrepresentation alleged in this case, which is that USSE had a "fully operational plant in production" as Rivera claimed in press releases beginning as early as October 26, 2006.  The plaintiff's expert and others agree that a pyrolytic process like Rivera's might someday be successful in extracting energy effectively from various forms of organic waste.  However, the focus of the Commission's case is the misrepresentation that USSE had developed its process to the point of full production.  Many of the documents filed with Rivera's Response, notwithstanding their lack of authentication, merely suggest that there may be promise to the "Rivera Process."  These documents are irrelevant to the question of whether the USSE

16

equipment actually worked as Rivera claimed.

The defendants' response makes three general arguments: (1) the "Rivera Process" is valuable; (2) Rivera did not author the false press releases; and (3) Rivera and Price did not profit from their sales of USSE and SSTP shares.

Rivera's argument that USSE had a commercial process is based upon the testimony of Brent, his longtime plant manager, the affidavit of Neil Boone, a purported contract with the Town of Vidalia, Louisiana, a Strategic Alliance Agreement between SSTP and L. Sole S.A., a Spanish company, a summary of USSE stock owned by Alice Price, an article on "Biochar Systems," and various other documents.  None of the defendants' submissions contradict the undisputed fact that USSE never had a fully operational plant. None of the defendants' arguments in their response address the misrepresentations that the USSE equipment could produce 6,000 gallons of fuel per day, that it could produce fuel for $0.50 per gallon, that USSE had engaged a prominent investment banker, that a prominent industry figure had joined USSE's board, that USSE had purchased its facility in Natchez, that it sold fertilizer in April of 2007, or that USSE product would begin shipping within 72 hours as of July 17, 2007.

Rivera's chief argument from Brent's testimony is that since USSE had storage capacity for 4 to 6,000 gallons of output, the plant was fully operational.  However, USSE could not have a "fully

17

operational plant in production" on October 26, 2006 (or be "Ready for Green Fuel Production" on January 17, 2007) if it could not store more than one day's purported output.  Brent also testified that the plant had only operated once for as long as four or five days continuously, and that they repeatedly modified the equipment and tested it for some shorter period of time.  Brent Deposition, pp. 24-27.  This testimony does not contradict the evidence that USSE never had a "fully operational plant in production." Moreover, the portions of Brent's deposition filed in support of the defendants' response establish that USSE's plant could not produce 6,000 gallons of fuel per day.  Brent Depo., pp. 24-25. Brent's testimony also admits that the output of the USSE equipment contained water and that they had to use a "whiskey still" to remove the water in order to produce USSE's so-called fuel.  Brent Depo., pp. 31, 33-35.  Despite the defendants' argument, Brent's testimony actually supports several of the plaintiff's critical misrepresentation claims.

The defendants also argue that the affidavit of Neil Boone[4] somehow creates a genuine issue of fact regarding the commercial viability of the "Rivera Process."  However, Boone's affidavit does not address whether USSE's large-scale reactor was ready for commercial production, whether it could produce 6,000 gallons per

_____

[4] Boone is employed by AMSPEC Services, LLC, a company that inspects and tests petroleum and chemicals.  Boone Aff., ¶ 4.

18

day of fuel, whether it could produce fuel for $0.50 per gallon, or whether any possible output from the "Rivera Process" would be economically viable to produce.  Boone's affidavit speaks only to the "test reactor at the Natchez, Mississippi plant."  Boone Aff., ¶¶ 5-8.  However, the uncontradicted testimony of Kelmer Smith, Jr., and Keith Mazer establishes that the output of the so-called mini-reactor was different from the so-called continuous operation reactor that was required for commercial production.  Smith Depo., pp. 98-100, 103, 105, 135; Mazer Depo., pp. 42-43, 75-76.

The balance of Boone's affidavit is inadmissible and fails to address any issue relevant to this case.  Boone's personal belief that USSE's liquid oil could be refined, stored and handled like a crude oil, and that the gaseous output may be used as a boiler fuel are unsupported by any facts and are, at best, the personal opinion of Boone, who is not offered as an expert and who does not support his conclusions with any facts.  Boone's opinions fail under Fed.R.Evi. 701 as the opinion testimony of a lay witness because his personal beliefs are not rationally based on actual observations and, at best, can only be based upon scientific and economic conclusions from data Boone never claims to have observed. There is nothing in Boone's affidavit to establish that he is qualified to render an expert opinion.  Nor does he disclose the basis for his personal conclusions or demonstrate that his opinions are the product of reliable scientific principles and methods as

required by Fed.R.Evi. 702 and 703.

At best, Boone's declaration can be read to challenge the fact that the "Rivera Process" could not produce five gallons of fuel from a bushel of soybeans.  That challenge, however, fails.  Another document filed with the response, although unauthenticated, claims that one bushel of soybeans produces 35 pounds of biocrude and 21 pounds of activated biochar.  Defendants' Exhibit 76-9, p. 2.  Applying Boone's calculation, one bushel of beans would only generate 4.7 gallons of fuel without accounting for its water content.  But it is undisputed that the biocrude generated by either the mini-reactor or the larger machine contains some amount of water that must be distilled to produce any useful product.  Smith Depo., pp. 26-29, 65-67, 98-100, 103, 105, 135; Mazer Depo., pp. 31-33, 44-46, 75-76.  Boone's affidavit fails to address the undisputed fact that there is water content in the Rivera biocrude, and fails to challenge the Commission's assertion that the claim that the "Rivera Process" could produce five gallons of fuel from one bushel of soybeans was false.

The defendants also argue that two purported contracts filed with their response demonstrate that USSE (or, later, SSTP) was commercially viable.  Wholesale Power Contract between USSE and Town of Vidalia, Louisiana; Strategic Alliance Agreement between SSTP and L. Sole, S.A.  The purported "Wholesale Power Contract," dated November 14, 2006, is unauthenticated and irrelevant and,

20

hence, is inadmissible to create any genuine issue of material fact. Moreover, on September 17, 2007, Rivera testified concerning the circumstances surrounding the contract:

Page 193


15 MR. LOUGH: Because I -- I don't -- I don't quite

16 understand that. You have another statement in -- in here --

17 in the press release it says, "USSEC announces it is in

18 receipt of multiple take or pay contracts to be disclosed

19 soon." Was that an accurate statement when made?

20 THE WITNESS: Which document are you referring to?

21 MR. LOUGH: I'm sorry, Exhibit Number 12, or is

22 this 14?

23 MR. WESTRICK: Twelve.

24 MR. LOUGH: Twelve, okay.

25 MR. WATSON: Twelve.


Page 194


1 THE WITNESS: Do I have a copy of that. Is this

2 12?

3 MR. WESTRICK: Yes, sir, it is.

4 MR. LOUGH: It is about the middle bullet point

5 without counting up and down.

6 THE WITNESS: Okay.

7 MR. LOUGH: "Announces it's in receipt of multiple

8 take or pay contracts to be disclosed soon"?

9 THE WITNESS: That's correct.

10 MR. LOUGH: That was accurate when made?

11 THE WITNESS: Accurate when made, City of Vidalia.

12 MR. LOUGH: Okay, well, that's one.

13 THE WITNESS: LEPA.

14 MR. LOUGH: Excuse me?

15 THE WITNESS: LEPA.

16 MR. LOUGH: How do you spell that?

17 THE WITNESS: Well, it's L-E-P-A.

18 MR. LOUGH: Okay. And you had those contracts in

19 hand at that time?

20 THE WITNESS: Those contracts were negotiated

21 between the City of Vidalia and LEPA, Kelmer Smith was doing

22 all the heat balance and the negotiations with them. They

23 started off wanting five megawatts and then they went to 50

24 megawatts, went from, I want to say eight, nine cents, I

25 don't remember exactly and it came all the way down to 4.3

page 195

1 cents. And then we discovered that they weren't -- they

2 weren't going to be using the capacity, they had maybe three

3 megawatts worth of capacity and they were selling the rest of

4 it to LEPA at twice, three times of what we were selling it

5 to them for.

6 MR. LOUGH: At the time that this press release

7 was issued in Exhibit Number 12 on October 26, 2006, did you

22

8 have executed contracts?

9 THE WITNESS: We didn't -- I did not sign them

10 under the per kilowatt charge that they were -- that was.

11 presented to me.

12 MR. LOUGH: You -- you named two entities with

13 whom, I guess, USSE had been in negotiations.

14 THE WITNESS: The City of Vidalia Power Authority

15 and LEPA, which is, I'm going to take a real good stab at it,

16 Louisiana Electric Power Authority Co-op.

17 MR. LOUGH: Okay. And -- but those were in

18 negotiations?

19 THE WITNESS: Those -- we had a -- we had a deal

20 already signed with the mayor and director of the Vidalia

21 Power Authority and in the contract it says that United had

22 to get LEPA's authority for power transmission and what that

23 ended up meaning that LEPA had to buy the excess power from

24 them. So we did have a contract signed with the City of

25 Vidalia that had a proviso in it that turned out to me more

Page 196

1 than just a boilerplate.

2 MR. LOUGH: Which meant that it wasn't of any

3 value?

4 THE WITNESS: It meant that -- yeah, they're in

5 agreement, they're going to buy, but we've got to get LEPA's

6 permission to put in the other 45 megawatts and transmit them

7 on their lines.

23

. . .


Page 199


15 MR. LOUGH: Okay. Did you -- did the company

16 derive any revenue from these take or pay contracts?

17 THE WITNESS: We are in a position to sell every

18 green certificate for every kilowatt of electricity that we

19 can produce, both in the United States and aboard.

20 MR. LOUGH: Okay. But did the company derive any

21 income from any take or pay contracts?

22 THE WITNESS: No, sir.

23 MR. LOUGH: Okay.

24 THE WITNESS: We haven't derived any income from

25 anything


Investigative Testimony of John H. Rivera, September 17, 2007, pp. 193-196, 199.

 Regardless of the actual language of the purported contract with the Town of Vidalia, Rivera testified in September of 2007 that the contracts were never completed because the pricing terms were unfavorable to USSE, and USSE never derived any revenue from this or any other contract.  Further, the basic terms of the contract demonstrate that it could only be commercially viable if USSE's equipment became fully operational:

  "DELIVERY TERM" means the period commencing the day after
  final acceptance testing and completion of SELLER'S

24

> RESOURCE rendering RESOURCE available for commercial POWER generation."

Wholesale Power Contract between USSE and Town of Vidalia, Louisiana, p. 15.

By its basic terms, the purported contract is irrelevant to the issue of whether USSE had a fully operational plant.  Rivera knew the contract had no real value because the contract, when it was entered (through the present), was impossible for USSE to perform.  On March 8, 2007, Rivera testified that USSE had not generated any revenue.  Investigative Testimony of John H. Rivera, March 8, 2007, pp. 70, 76, 97.  A contract that was not completed and could not be performed does not make USSE a commercially viable company.

Rivera also argues that various unsubstantiated, unauthenticated claims about the value of USSE's biochar demonstrate that the USSE process was commercially viable.  See, e.g., defendants' exhibits 75-1, 75-9, 75-11, 76-8, 76-9.  However, the unauthenticated and factually unsupported claims of Michael Garjian, President of Vee-Go Energy, fail to demonstrate the relationship between USSE's biochar and Garjian's claims of atmospheric remediation.  There are no references to any test results demonstrating that the biochar had been tested in greenhouses or trials in any scientific way, and no documentation that the cost of producing carbon by using the "Rivera Process" to produce biochar is economically viable.  Garjian's deposition does

25

establish, however, that USSE's April 3, 2007, press release that
it had made its first sale of fertilizer was false because nothing
was shipped to Garjian until more than two years after the press
release.  Garjian Depo., pp. 11-13, 29.  According to Garjian, he
received approximately 1700 pounds of fertilizer in June of 2009,
but did not receive a bill and did not pay for the fertilizer.  Id.

Rivera also submits a purported patent application and related
correspondence to attempt to show USSE's commercial value.  It is
undisputed that Rivera filed patent applications which were never
completed, and which lacked sufficient details to allow the patent
applications to be evaluated.  Rivera Depo. of August 30, 2010, pp.
160-162, 169-172; Patent Application of April 27, 2006.  However,
in a January 17, 2007, press release and many others (cited in
footnote 15 of plaintiff's reply brief), USSE made repeated
representations that it owned patent pending technology for
creating biofuels and fertilizer.  For example, on October 12,
2006, USSE issued a press release containing a section titled,
"About U.S. Sustainable Energy Corp." which stated:

> USSE holds patent pending technology for a new
> breakthrough biofuel and carbon based fertilizer.  USSE
> has successfully demonstrated the most cost effective
> method of producing biofuel estimated at $.50/gallon
> according to exhaustive studies and independent lab
> confirmation.[5]  The company has developed the process,
> units, and catalyst that will transform agricultural
> biomass into biofuel and fertilizer.

---

[5] There was no independent lab confirmation.  See Smith Depo.,
pp. 44-45.

USSE Press Release, Oct. 12, 2006.  Many of USSE's press releases
emphasized the importance of its patent-pending technology; but, in
fact, USSE's "patent pending" claims were false.  USSE never owned
any patent pending technology.  Rivera, not USSE, filed and owned
the provisional patents USSE claimed to hold.  Rivera Depo. of
August 30, 2010, p. 161; Patent Applications of April 5, 2006.

     In addition to their response, Rivera and Price have filed a
List of Genuine Issues of Material Fact that argues, among other
things, that Rivera never authored any press releases, that
attorneys and others edited and approved the press releases, and
that in any event the press releases were somehow protected because
they contained boilerplate concerning "forward-looking" statements
that brought them within the safe harbor provisions of Section
21(E) of the Securities Exchange Act of 1934 ("Exchange Act").

     The Commission maintains that these arguments do not create
any genuine issue of fact that is relevant to this case.  First, as
the plaintiff repeatedly emphasizes, the purported exhibits on
which the defendants rely are not authenticated by anyone.  For
example, defendants' exhibit 76-3, which purports to be the USSE
policy for publishing press releases, is unauthenticated and there
is no basis to believe that it was ever put into place.  The same
is true for various unauthenticated email strings (exhibits 75-8
and 76-4) which purport to show that persons other than Rivera were
involved in the editing of various press releases.  Moreover,

27

Rivera has admitted that he was responsible for USSE's press releases.  Rivera Depo. of March 8, 2007, pp. 52-62 (Rivera had the final word on press releases and all changes went through him), pp. 191-192 ("when I put a press release out or I'm involved in a press release, I want to make sure that every word, every comma, every symbol is correct"); Mazer Depo., p. 89 (Mazer transmitted the press releases to the wire service after he received the approved press release from Rivera).

The defendants also suggest, without documentation, that Rivera is not liable for his false press releases because they might have been approved by attorneys.  A good faith reliance on an attorney or an accountant's advice is not a defense to securities fraud.  It simply represents possible evidence of an absence of any fraudulent intent.  <u>United States v. Peterson</u>, 101 F.3d 375, 381 (5th Cir. 1996); <u>In re Zonagen, Inc. Securities Litigation</u>, 322 F.Supp.2d 764, 775 (S.D. Tex. 2003).  However, no good faith defense can be established unless the defendants show by a preponderance of the evidence: (1)  that Rivera informed the lawyers of all relevant facts; (2) that he did not misrepresent any relevant facts to the lawyers; (3) that he asked the lawyers for a specific opinion about the particular point that on which he claims to rely; and (4) that he actually received the specific opinion he requested from the lawyers on which he claims to rely.  <u>United States v. Duncan</u>, 850 F.2d 1104, 1116 (6th Cir. 1988).  Rivera has

28

not even attempted to establish such a defense, nor has he submitted any evidence in support of such.

Section 21(E) of the Exchange Act (15 U.S.C. §78u-5) provides a safe harbor for forward-looking statements, but is not available to USSE in this case. Section 21(E)(b)(C) excludes penny stock companies from any such safe harbor. Moreover, Section 21(E)'s safe harbor provision and the "bespeaks caution" doctrine[6] apply to forward-looking statements only, and not to material omissions or misstatements of historical fact. In re Constellation Energy Group, Inc. Securities Litigation, 738 F.Supp.2d 614, 625 (D. Md. 2010). Here, any application of the safe harbor rule is ineffective both because USSE has always been a penny stock (see Plaintiff's Statement of Undisputed Facts, ¶ 1) and, more critically, because misrepresentations such as that USSE has a "fully operational plant in production" materially misstate historical facts and are not forward-looking in any regard.

The undisputed evidence in this case establishes the core misrepresentations that USSE had a "fully operational plant in production" and was "ready for Green Fuel production." The undisputed evidence also proves other repeated misrepresentations: that USSE had engaged a prominent investment banker; that a

_____

[6] The "bespeaks caution" doctrine, similar to the PSLRA safe harbor provision, survived enactment of the PSLRA and protects optimistic projections accompanied by cautionary language. In re Securities Litigation BMC Software, Inc., 183 F.Supp.2d 860 (S.D. Tex. 2001).

prominent industry figure had joined its board; that USSE had purchased its production facility in Natchez; that USSE had patented technology; that USSE owned patent pending technology; that USSE sold fertilizer in April 2007 and was a revenue producing company; and that USSE had developed an OD-66 certified product that it would begin shipping in 72 hours.  The core misrepresentations are supported by undisputed collateral facts that USSE could not produce 6,000 gallons of fuel per day as Rivera repeatedly claimed; that USSE's equipment had never been continuously operated for more than four or five days; and that USSE had no reasonable basis to claim that it could produce fuel for $0.50 per gallon.  Rivera's attempt to create an issue of fact as to whether USSE could produce five gallons of fuel from each bushel of soybeans fails because Boone's affidavit fails to address the undisputed fact that the biocrude from the Rivera Process, even in the mini-reactor, contains some percentage of water, which might be higher than 25%.  The Response offers no evidence to contradict the testimony of Brent (Rivera's trusted plant manager), Smith (the chemical engineer), and Mazer (Rivera's almost constant companion for a year) that the USSE equipment never produced as much as half of 6,000 gallons per day, that the USSE biocrude output contained significant amounts of water that had to be removed to produce any fuel, that USSE never had a product to sell and that the USSE equipment was experimental and never operated continuously for

longer that four or five days.

Each of these material misrepresented facts establishes a violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, as alleged in the complaint.  Together, they establish repeated material misrepresentations to USSE investors that allowed enough USSE shares to be sold for Rivera to continue falsely promoting the company

The plaintiff has demonstrated that it is entitled to summary judgment on the issue of liability.  The Court turns now to the issue of remedies.  "A district court in an SEC enforcement action has the authority, through its equitable jurisdiction, to fashion an appropriate remedy on a proper showing of a securities violation."  SEC v. Current Financial Services, Inc., 783 F.Supp. 1441, 1443 (D. D.C. 1992), citing SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1103 (2nd Cir. 1973).  In its motion, the plaintiff seeks the following relief:

1.  Injunctions against USSE and Rivera against future violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act")(15 U.S.C. § 78j(b)) and Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder;

2. A bar against Rivera from acting as a director or officer of any issuer having a class of securities registered with the Commission pursuant to Section 12 of the Exchange Act (15 U.S.C. § 78l) or required to file reports pursuant to Section 15(d) of the

31

Exchange Act (15 U.S.C. § 78o(d));

     3. A Penny Stock bar against Rivera pursuant to Section 21(d) of the Exchange Act (15 U.S.C. § 78u(d));

     4. Disgorgement and prejudgment interest against USSE, Rivera and Price; and

     5. Civil penalties pursuant to Section 21(d)(3) of the Exchange Act (15 U.S.C. §§ 78u) against USSE and Rivera. Plaintiff's Motion for Summary Judgment, p. 2.

     First, the Commission seeks a permanent injunction prohibiting USSE and Rivera from violating Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 of the Securities and Exchange Commission.  Such relief is authorized by statute, which provides:

> Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices constituting a violation of any provision of this chapter, [and/or] the rules or regulations thereunder, ... it may in its discretion bring an action in the proper district court of the United States ... to enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond. ...

15 U.S.C. § 78u(d)(1).

     "The courts have an obligation, once a violation has been established, to protect the public from a continuation of the harmful and unlawful activities."  United States v. Parke, Davis & Co., 362 U.S. 29, 48 (1960).  "A District Judge is vested with a wide discretion when an injunction is sought to prevent future violations of the securities laws ... and 'cessation of illegal

activity does not ipso facto justify the denial of an injunction.'" Commission v. Universal Major Industries Corp., 546 F.2d 1044, 1048 (2nd Cir. 1976). An injunction from further violations of the federal securities laws is proper if "the inferences flowing from defendant's prior illegal conduct, viewed in light of present circumstances, betoken a 'reasonable likelihood' of future transgressions." SEC v. Zale Corp., 650 F.2d 718, 720 (5th Cir. 1981). The Fifth Circuit has suggested several non-exclusive factors which a district court may consider: "(1) the egregiousness of the defendant's actions, (2) the isolated or recurrent nature of the infraction, (3) the degree of scienter involved, (4) the sincerity of the defendant's assurances against future violations, (5) the defendant's recognition of the wrongful nature of his conduct, and (6) the likelihood that the defendant's occupation will present opportunities for future violations." SEC v. Blatt, 583 F.2d 1325, 1334 n.29 (5th Cir. 1978), citing Universal Major Indus., 546 F.2d at 1048; Manor Nursing, 458 F.2d at 1100.

Second, the plaintiff requests the Court to enter an Order permanently prohibiting Rivera from acting as a director or officer of any issuer having a class of securities registered with the Commission pursuant to Section 12 of the Exchange Act (15 U.S.C. § 78l) or required to file reports pursuant to Section 15(d) of the Exchange Act (15 U.S.C. § 78o(d)).

Section 21(d)(2) of the Exchange Act authorizes courts in SEC

civil actions to issue an order prohibiting any person who violated Section 10(b) of the Exchange Act from acting as an officer or director of any company that has a class of securities registered with the SEC pursuant to Section 12 of the Exchange Act, or that is required to file reports with the SEC pursuant to Section 15(d) of the Exchange Act, if that person's conduct demonstrates his unfitness to serve as an officer or director of such an issuer. See 15 U.S.C. § 78u(d)(2).

Courts generally consider six factors when making an "unfitness" determination: "(1) the 'egregiousness' of the underlying securities law violation; (2) the defendant's 'repeat offender' status; (3) the defendant's 'role' or position when he engaged in the fraud; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that misconduct will recur." See SEC v. Patel, 61 F.3d 137, 141 (2nd Cir. 1995); SEC v. First Pacific Bancorp, 142 F.3d 1186, 1193 (9th Cir. 1998); SEC v. Quinlan, 373 Fed.Appx. 581, 586 (6th Cir. 2010). Courts may consider some of the factors, all of them, or additional factors. Patel, 61 F.3d at 141.

Third, the Commission seeks an Order barring Rivera from participating in any offerings of penny stock. Section 603 of the Sarbanes-Oxley Act amended Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d), to provide federal courts with statutory authority to bar an individual from participating in an offering of penny

34

stock.    A person participating in an offering of penny stock
includes one who engages "in activities with a[n] ... issuer for
purposes of the issuing, trading, or inducing or attempting to
induce the purchase or sale of, any penny stock."    Section
21(d)(6)(B) of the Exchange Act (15 U.S.C. § 78u(d)(6)(B)).    A
penny stock must, inter alia, have tangible net assets of less than
$2,000,000, have a value less than $5 per share, and not be a
national market stock with a market value of listed securities
greater than $50 million for 90 consecutive days.    17 C.F.R. §
240.3a51-1.    See SEC v. McNamee, 481 F.3d 451, 456 (7th Cir. 2007)
("[a] penny stock is any equity security that has a price of less
than five dollars, except as provided in Rule 3a51-1 under the
Exchange Act (17 C.F.R. 240.3a51-1)).").    This request reflects the
degree to which the SEC considers Rivera to be a hazard to the
public investing community.

Fourth, the plaintiff requests the Court to order USSE, Rivera
and Price to disgorge the ill-gotten gains they received.
Disgorgement is designed both to deprive a wrongdoer of his unjust
enrichment and to deter others from violating the securities laws.
SEC v. Blatt, 583 F.2d 1325, 1335 (5th Cir. 1978); SEC v. First City
Fin. Corp., 890 F.2d 1215 (D.C. Cir. 1989); Manor Nursing, 458 F.2d
at 1104 ("The effective enforcement of the federal securities laws
requires that the SEC be able to make violations unprofitable.").
The Commission urges that, in light of the "pervasive" fraud

committed by the defendants, the Court should order all profits stemming from the scheme to be disgorged. See CFTC v. British Am. Commodity Options Corp., 788 F.2d 92, 93-94 (2nd Cir. 1986).

The law does not require precision in determining the proper amount of disgorgement. "The District Court has broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged." SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1475 (2nd Cir. 1996). The Commission "is entitled to disgorgement upon producing a reasonable approximation of a defendant's ill-gotten gains." Calvo, 378 F.3d at 1217. In determining the appropriate disgorgement amount, all doubts "are to be resolved against the defrauding party." SEC v. First City Fin. Corp., 688 F. Supp. 705, 727 (D. D.C. 1988) (quoting SEC v. McDonald, 699 F2d 47, 55 (1st Cir. 1983)). "Once the [Commission] has established that the disgorgement figure is a reasonable approximation of unlawful profits, the burden of proof shifts to the defendants, who must 'demonstrate that the disgorgement figure is not a reasonable approximation.'" SEC v. Hughes Capital Corp., 917 F. Supp. 1080, 1085 (D. N.J. 1996) (quoting First City, 890 F.2d at 1232).

The Commission also seeks prejudgment interest on the amount of disgorgement ordered. Where a securities law violator has enjoyed access to funds over a period of time as a result of his wrongdoing, requiring the violator to pay prejudgment interest is

consistent with the equitable purpose of disgorgement.  Id. at 1090.

Fifth, The Commission seeks civil money penalties against Rivera and USSE pursuant to Section 21(d)(3) of the Exchange Act (15 U.S.C. § 78u(d)(3)).  A civil penalty is determined "in light of the facts and circumstances" of a particular case.  15 U.S.C. § 78u(d)(3)(B)(i).  "First tier" penalties for violations occurring after February 14, 2005, but on or before March 3, 2009, may be imposed up to the greater of $6,500 or the amount of ill-gotten gain to the defendant as a result of the violation.  See 17 C.F.R. § 201.1003.  When the violation involves fraud, "second tier penalties" may be imposed up to the greater of $65,000 or the amount of ill-gotten gain to the defendant as a result of the violation.  A "third tier" civil penalty of up to the larger of $130,000 or the amount of pecuniary gain to the defendant as a result of the violation may be imposed if the violation involved fraud or deceit and the violation resulted in substantial losses or created a significant risk of substantial losses to other persons. Id.  The decision to impose a penalty, and the amount of any such penalty, is a matter within the discretion of the Court.  In determining whether to award civil penalties, courts consider numerous factors, including the egregiousness of the violation, the isolated or repeated nature of the violations, the degree of scienter involved, whether the defendant concealed his trading, and

the deterrent effect given the defendant's financial worth.  SEC v. Sargent, 329 F.3d 34, 42 (1st Cir. 2003).

In light of the numerous findings that must be made by the Court in fashioning appropriate remedies, the Court shall conduct a hearing on remedies, to be held August 8, 2011.  The parties may present any additional written arguments in advance of the hearing, should they desire to do so, on or before August 1, 2011.

Accordingly,

IT IS HEREBY ORDERED that the plaintiff Securities and Exchange Commission's motion for summary judgment **(docket entry 61)** is GRANTED as to liability;

FURTHER ORDERED that a hearing on remedies shall be held August 8, 2011.  Any additional written arguments shall be filed on or before August 1, 2011.

SO ORDERED, this the 21st day of July, 2011.


/s/ David Bramlette
UNITED STATES DISTRICT JUDGE

38