IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : <br> : <br> : <br> : |
| Plaintiff, <br> v. | :    Civil Action No. <br> :    5:08CV245   DCB-JMR <br> : |
| U.S. SUSTAINABLE ENERGY CORP. AND JOHN H. RIVERA, | : <br> : <br> : |
| Defendants. | : <br> : |
| ALICE M. PRICE, | : <br> : <br> : |
| Relief Defendant. | : |

**PLAINTIFF'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW**

Plaintiff Securities and Exchange Commission ("Commission") respectfully submits its Proposed Findings of Fact and Conclusions of Law with respect to remedies in the above-captioned matter.

**I. Proposed Findings of Fact**

   **A. Background**

1. In response to the Commission's Motion for Summary Judgment (Dkt. 61), the Court issued its Memorandum Opinion and Order dated July 21, 2011 (Dkt. 88). The Court thereby granted the Commission's motion on the issue of liability, finding Defendants U.S. Sustainable Energy Corp. ("USSE") and John H. Rivera ("Rivera") liable for violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder. Dkt. 88 at 38.

2. USSE's and Rivera's liability was based on a series of misstatements made to the public by USSE under Rivera's direction. See id. at 29-31.

3. On October 26, 2006, USSE announced contrary to facts and Rivera's knowledge (a) that it was then in receipt of multiple take or pay contracts; (b) that it could then produce five gallons of fuel from one bushel of soy beans; and (c) that its plant was then a fully operational plant in production. Id. at 29-30.

4. On November 15, 2006, USSE announced contrary to facts and Rivera's knowledge that Dr. David E. Crowe had joined its board of directors. Id.

5. On November 16, 2006, USSE announced contrary to facts and Rivera's knowledge that it had engaged a prominent investment banker. Id. at 29.

6. On December 12, 2006, USSE announced via press release contrary to fact and Rivera's knowledge that it had acquired a 35-acre manufacturing facility. Id. at 30.

7. On December 12, 2006, USSE announced in a second press release contrary to fact and Rivera's knowledge that it had acquired a manufacturing facility in an all-cash transaction. Id.

8. On January 17, 2007, USSE announced contrary to fact and Rivera's knowledge (a) that it was ready for green fuel production and (b) that it could produce 6,000 gallons daily. Id. at 29-30.

9. On April 3, 2007, USSE announced contrary to fact and Rivera's knowledge that it had made its first commercial sale of fertilizer. Id. at 30.

10. On July 17, 2007, USSE announced contrary to fact and Rivera's knowledge (a) that it had developed an OD-66 certified product and (b) that it would begin shipping the product in 72 hours. Id.

11.     USSE claimed on an ongoing basis, contrary to fact and Rivera's knowledge, that it could produce "biofuel estimated at $.50/gallon according to exhaustive studies and independent lab confirmation." The claim appeared in a section called "About U.S. Sustainable Energy" which was included in 24 press releases made on the following dates: October 13, 2006, October 16, 2006, October 17, 2006 (two releases), October 20, 2006, October 26, 2006, October 30, 2006, November 1, 2006, November 2, 2006, November 3, 2006, November 6, 2006, November 7, 2006, November 9, 2006, November 13, 2006, November 15, 2006, November 16, 2006, November 21, 2006 (two releases), November 22, 2006, December 5, 2006, December 6, 2006, December 12, 2006 (two releases) and January 5, 2007. See Dkt. 61, Ex. 4-6.

12.     USSE claimed on an ongoing basis, contrary to fact and Rivera's knowledge, that it "holds patent pending technology." The claim appeared in a section called "About U.S. Sustainable Energy" which was included in 31 press releases. The claim appeared in the 24 press releases listed in the preceding paragraph, as well as seven other press releases dated January 8, 2007, January 9, 2007, January 10, 2007, January 17, 2007, January 22, 2007, January 23, 2007 and January 25, 2007. Id.

13.     Each of the foregoing material misrepresented facts establishes a violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5 thereunder. See Dkt. 88 at 31. Consequently, Rivera and USSE committed at least 38 violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. Since multiple material misstatements appear in the same press releases, the number of violations could be much higher.

B. <u>**New Findings**</u>

14. The Memorandum Opinion and Order dated July 21, 2011 (Dkt. 88) called for an additional evidentiary hearing on the issue of remedies. The evidentiary hearing was held on August 9, 2011.

15. Relief Defendant Alice M. Price ("Price") filed a Notice of Suggestion of Death on August 16, 2011 (Dkt. 94), alleging that Rivera had died. The Commission filed a Notice of Filing of a Certificate of Death on September 8, 2011 (Dkt. 97), confirming Rivera's death.

16. Prior to notice of Rivera's death, the Commission's prayer for relief had five components: (a) injunctions against USSE and Rivera for future violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder; (b) a bar against Rivera from acting as a director or officer of any issuer having a class of securities registered with the Commission pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)]; (c) a Penny Stock bar against Rivera pursuant to Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)]; (d) disgorgement and prejudgment interest against USSE, Rivera, and Price; and (e) civil penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. §§ 78u] against USSE and Rivera.

17. Following the Court's ruling that Rivera and USSE were liable for violations of Section 10(b) and Rule 10b-5, Rivera continued to assert that USSE made *no* false statements in its press releases. <u>See</u> Tr. of August 2, 2011 Evidentiary Hr'g at 14. At the same time, Rivera refused to acknowledge any harm to USSE investors. <u>See id.</u> at 26-7. Rivera stated that, as long as he was alive and physically able, he would continue to refine the "Rivera Process" which was at the heart of USSE's false statements to the investing public, and he would attempt to make a living off of his research. <u>See id.</u> at 30.

18. Rivera and Price together sold shares in USSE and used the proceeds to pay their personal expenses and to keep USSE and another business venture running. See id. at 30-31 (Rivera stating proceeds from sale largely put back into company); see also Dkt. 61, Ex. 2 at ¶¶ 139, 143-4. During the period from September 2006 through June 2008, Price sold 15,837,740 shares of USSE, generating proceeds of $1,492,687.53. See Dkt. 61, Ex. 2 at ¶¶ 139, 143-4; see generally DeWitt Dep., Ex. B (compiling global trades in USSE). Price does not challenge the Commission's computation, which is based on Price's brokerage account statements. See Tr. of August 2, 2011 Evidentiary Hr'g at 40-5.

19. Additionally, Price cannot point to a compensation plan or debt which explains why Rivera originally transferred the USSE shares to her. Price denies that she was ever employed by Rivera personally to care for him during ill health. See Tr. of August 2, 2011 Evidentiary Hr'g at 37. Price began assisting Rivera with the management of USSE and his other business ventures in 2002; however, she was not officially placed on the USSE payroll until early 2006. See id. at 37-40. During the period when she was not paid directly by USSE, Price describes her source of financial support as follows: "John [Rivera] and I supported each other." Id. at 40. Even after she was placed on the payroll of two of Rivera's companies, Price was still supported at times by Rivera out of whatever funds they had. Id. at 50.

20. Price points to a number of checks written out of her personal accounts for expenses related to Rivera's business ventures. Id. at 45-7. Price characterizes her personal payments on behalf of USSE and Rivera's other business ventures as a "loan." Id. at 40. When asked where she obtained the funds to put over $2.4 million into Rivera's business ventures, Price responded that the funds came from the sale of USSE and other stock and a $125,000 loan from a personal friend, Admiral Lora. Id. at 45-46, 49. Price acknowledges that Lora expected

the loan to be used for business or personal expenses, as Price and Rivera saw fit. Id. at 49. Price has also indicated she had personal savings of approximately $30,000 when she became involved with Rivera, which was a source of funds loans to Rivera's business ventures. Id. at 40.

21. The Court cannot credit Price's explanation for her legitimate claim on the USSE shares which were sold at inflated prices. The finances of Price and Rivera were commingled to the extent that Price cannot identify the source of funds used for any particular expenditure. See id. at 49. The personal obligations of the couple and the business obligations of Rivera's companies were often indistinguishable to Price. See id.

22. Rivera and Price had access to the proceeds from the USSE stock sales from August 1, 2008 through August 31, 2010. Based on the delinquent tax rate established by the Internal Revenue Service, see I.R.C. § 6621(a)(2), and quarterly accrual of interest at the applicable rate, the benefit to Rivera and Price from access to the proceeds is equivalent to $143,852.59. The quarter-by-quarter interest accrual is as follows:

| Quarter Range | Annual Rate | Period Rate | Quarter Interest | Principal+Interest |
| --- | --- | --- | --- | --- |
| Violation Amount | | | | $1,492,687.53 |
| 08/01/2008-09/30/2008 | 5% | 0.83% | $12,439.06 | $1,505,126.59 |
| 10/01/2008-12/31/2008 | 6% | 1.5% | $22,576.90 | $1,527,703.49 |
| 01/01/2009-03/31/2009 | 5% | 1.25% | $19,096.29 | $1,546,799.78 |
| 04/01/2009-06/30/2009 | 4% | 1% | $15,468.00 | $1,562,267.78 |
| 07/01/2009-09/30/2009 | 4% | 1% | $15,622.68 | $1,577,890.46 |
| 10/01/2009-12/31/2009 | 4% | 1% | $15,778.90 | $1,593,669.36 |
| 01/01/2010-03/31/2010 | 4% | 1% | $15,936.69 | $1,609,606.05 |
| 04/01/2010-06/30/2010 | 4% | 1% | $16,096.06 | $1,625,702.11 |
| 07/01/2010-08/31/2010 | 4% | 0.67% | $10,838.01 | $1,636,540.12 |

| **Prejudgment Violation Range** | **Quarter Interest Total** | **Prejudgment Total** |
|---|---|---|
| **08/01/2008-08/31/2010** | **$143,852.59** | **$1,636,540.12** |

## II. Proposed Conclusions of Law

23.     The issue of remedies is now ripe for disposition.

24.     In an SEC enforcement action, this Court has the authority through its equitable jurisdiction to fashion an appropriate remedy on a proper showing of a securities violation.  See SEC v. Current Financial Services, Inc., 783 F.Supp. 1441, 1443 (D. D.C. 1992) (citing SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1103 (2nd Cir. 1973)).

25.     Several of the remedies requested by the Commission are no longer applicable following Rivera's death.  The Commission no longer requires the following equitable relief to protect the investing public: an injunction against Rivera for future violations of Section 10(b) and Rule 10b-5; an injunction against Rivera from acting as a director or officer of any issuer of registered securities or a reporting company; and a Penny Stock bar against Rivera.

26.     However, the Commission is entitled to each of the other remedies contained in its prayer for relief.

### A. Injunction against USSE

27.     The Exchange Act authorizes permanent injunctions when a person is engaged or about to engage in any acts or practices constituting a violation of any provision of the Act and/or the rules or regulations thereunder.  15 U.S.C. § 78u(d)(1).  Once a violation has been established, the courts have an obligation to protect the public from a continuation of the harmful and unlawful activities.  United States v. Parke, Davis & Co., 362 U.S. 29, 48 (1960).  When an injunction is sought to prevent future violations of the securities laws, a District Judge has a wide

7

discretion including granting an injunction in spite of a cessation of illegal activity. See Commission v. Universal Major Industries Corp., 546 F.2d 1044, 1048 (2nd Cir. 1976). An injunction from further violations of the federal securities laws is proper if "the inferences flowing from defendant's prior illegal conduct, viewed in light of present circumstances, betoken a 'reasonable likelihood' of future transgressions." SEC v. Zale Corp., 650 F.2d 718, 720 (5th Cir. 1981).

28.     The Fifth Circuit has suggested several non-exclusive factors which a district court may consider: (1) the egregiousness of the defendant's actions, (2) the isolated or recurrent nature of the infraction, (3) the degree of scienter involved, (4) the sincerity of the defendant's assurances against future violations, (5) the defendant's recognition of the wrongful nature of his conduct, and (6) the likelihood that the defendant's occupation will present opportunities for future violations. SEC v. Blatt, 583 F.2d 1325, 1334 n.29 (5th Cir. 1978) (citing Universal Major Indus., 546 F.2d at 1048; Manor Nursing, 458 F.2d at 1100).

29.     The Commission has already established that USSE committed violations of the securities laws. The Commission has further established a reasonable likelihood that USSE will continue to transgress these laws. Five of the relevant factors are present here.

30.     First, USSE's actions were egregious. The size of the harm produced by USSE's misstatements is egregious: thousands of investors purchased millions of shares of USSE securities in this "pump and dump" scheme. See DeWitt Dep., Ex. B. The nature of the misstatements was egregious: For instance, at a time when Dr. David Crow had not even heard of USSE, USSE informed the public that this respected scientist had made glowing endorsements of USSE and that he had accepted a seat on USSE's board of directors. Finally, the repetition and volume of misstatements was egregious.

31.     Second, USSE's violations of the securities laws were recurrent.  This circumstance both reflects the egregiousness of USSE's actions and is an independent factor which tends to show a likelihood of future misconduct.

32.     Third, USSE acted with a high degree of scienter here.  In each of the misstatements found here, Rivera caused USSE to release information to the public which he knew to be false.

33.     With respect to the fourth and fifth factors, USSE has never acknowledged the wrongfulness of its conduct, nor has it made assurances against future violations.  The sixth factor is not relevant to a corporate defendant.

34.     Weighing these factors together, the Commission has established that USSE is reasonably likely to repeat its misconduct in the future.  Thus the Commission is entitled to a permanent injunction against USSE to prevent future violations of Section 10(b) and Rule 10b-5.

35.     The Commission is entitled to the permanent injunction against USSE, notwithstanding any evidence that USSE has ceased doing business or that it has been dissolved under state law.  In <u>SEC v. Diversified Corp. Consulting Grp.</u>, 378 F.3d 1219 (11th Cir. 2004), the Court of Appeals affirmed a permanent injunction against a Florida limited liability company which had been administratively dissolved.  The District Court was within its discretion in considering the LLC's ability to become reinstated at a later date.  <u>Id.</u>; <u>see also</u> <u>SEC v. Gane</u>, 2005 WL 90154 (S.D. Fla. 2005) (extending <u>Diversified</u> to two dissolved companies which had "long since ceased doing business").

**B. Disgorgement and Prejudgment Interest against USSE, Rivera's Estate, and Price**

36. The purpose of disgorgement is to deprive a wrongdoer of his unjust enrichment and to deter others from violating the securities laws. SEC v. Blatt, 583 F.2d 1325, 1335 (5th Cir. 1978); SEC v. First City Fin. Corp., 890 F.2d 1215 (D.C. Cir. 1989); Manor Nursing, 458 F.2d at 1104 ("The effective enforcement of the federal securities laws requires that the SEC be able to make violations unprofitable."). Where defendants' conduct is marked by "pervasive" fraud, the Court may order all profits stemming from the scheme to be disgorged. See CFTC v. British Am. Commodity Options Corp., 788 F.2d 92, 93-94 (2nd Cir. 1986).

37. The law does not require precision in determining the proper amount of disgorgement. The District Court has broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged." SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1475 (2nd Cir. 1996). The Commission is entitled to disgorgement upon producing a reasonable approximation of a defendant's ill-gotten gains. Calvo, 378 F.3d at 1217. In determining the appropriate disgorgement amount, all doubts "are to be resolved against the defrauding party." SEC v. First City Fin. Corp., 688 F. Supp. 705, 727 (D. D.C. 1988) (quoting SEC v. McDonald, 699 F2d 47, 55 (1st Cir. 1983)). "Once the [Commission] has established that the disgorgement figure is a reasonable approximation of unlawful profits, the burden of proof shifts to the defendants, who must 'demonstrate that the disgorgement figure is not a reasonable approximation.'" SEC v. Hughes Capital Corp., 917 F. Supp. 1080, 1085 (D. N.J. 1996) (quoting First City, 890 F.2d at 1232).

38. Where a securities law violator has enjoyed access to funds over a period of time as a result of his wrongdoing, requiring the violator to pay prejudgment interest is consistent with the equitable purpose of disgorgement. Id. at 1090. The Internal Revenue Service's delinquent

tax rate reflects what it would have cost to borrow a sum of money from the government and therefore reasonably approximates one of the benefits a defendant receives from having access to the proceeds of fraud.  See First Jersey, 101 F.3d at 1476.

39.     Rivera's death is not a bar to a disgorgement order.  A civil action for damages commenced by or on behalf of the United States or in which it is interested shall not abate on the death of a defendant but shall survive and be enforceable against his estate as well as against surviving defendants.  28 U.S.C. § 2404.  Several courts have held that a cause of action for violation of Rule 10b-5, sounding in equity and calling for remedial recovery, survives under the statute.  See, e.g., Federal Sav. & Loan Ins. Corp. v. Fielding, 316 F.Supp. 82, 85 (D.Nev. 1970).

40.     Traditionally, federal common law governs the survivability of claims arising under the federal securities laws.  See Wright, Miller and Kane, 7C FED. PRAC. & PROC. CIV. (3d ed.) § 1954.  Under federal common law, a claim survives a defendant's death if the claim is remedial rather than penal in nature.  Id.  Under the traditional analysis, an action arising under the securities laws seeking disgorgement of profits is remedial rather than penal.  See Epstein v. Schindler, 200 F.Supp. 836, 837-9 (S.D.N.Y. 1961).

41.     The Commission is entitled to disgorgement against Price as Relief Defendant.  Federal courts may order equitable relief against a person who is not accused of wrongdoing in a securities enforcement action where that person: (a) has received ill-gotten funds; and (b) does not have a legitimate claim to those funds.  See CFTC v. Walsh, 618 F.3d 218, 225 (2d Cir. 2010) (citing SEC v. Cavanaugh, 155 F.3d 129, 136 (2d Cir. 1998)).

42.     The Commission has established reasonable approximations of the ill-gotten gains which flowed to Rivera and Price as a result of the "pump and dump" scheme and the benefit which inured to Rivera and Price from their long-term access to the proceeds from the scheme.

Thus the Court will order Rivera's estate and Price to disgorge $1,492,687.53 and to pay prejudgment interest of $143,852.59, totaling $1,636,540.12.

### C. Civil Penalties against USSE and Rivera's Estate

43.     A civil penalty is determined "in light of the facts and circumstances" of a particular case. 15 U.S.C. § 78u(d)(3)(B)(i). "First tier" penalties for violations occurring after February 14, 2005, but on or before March 3, 2009, may be imposed up to the greater of $6,500 or the amount of ill-gotten gain to the defendant as a result of the violation. See 17 C.F.R. § 201.1003. When the violation involves fraud, "second tier penalties" may be imposed up to the greater of $65,000 or the amount of ill-gotten gain to the defendant as a result of the violation. A "third tier" civil penalty of up to the larger of $130,000 or the amount of pecuniary gain to the defendant as a result of the violation may be imposed if the violation involved fraud or deceit and the violation resulted in substantial losses or created a significant risk of substantial losses to other persons. Id.  The decision to impose a penalty, and the amount of any such penalty, is a matter within the discretion of the Court. In determining whether to award civil penalties, courts consider numerous factors, including the egregiousness of the violation, the isolated or repeated nature of the violations, the degree of scienter involved, whether the defendant concealed his trading, and the deterrent effect given the defendant's financial worth. SEC v. Sargent, 329 F.3d 34, 42 (1st Cir. 2003).

44.     Rivera's death is not a bar to an award of civil penalties. The court in Fielding further held that the cause of action under Rule 10b-5, rooted in equity, may survive even if punitive damages are requested, and that punitive damages may be awarded if the cause of action is otherwise one that survives. 316 F.Supp. at 85. Because the civil penalties here presuppose

disgorgement of ill-gotten gains, the action survives Rivera's death and civil penalties may be assessed against Rivera's estate.

45.     For all of the reasons which justify a permanent injunction here, USSE's and Rivera's conduct falls under the "third tier."  The Court may assess a penalty against each of them in an amount it deems appropriate for each violation.


Dated: November 10, 2011                    Respectfully Submitted,


                                                              */s/ Alex Rue*

                                                              Alex Rue
                                                              Senior Trial Counsel
                                                               Georgia Bar No. 618950

                                                              COUNSEL FOR PLAINTIFF
                                                              Securities and Exchange
                                                                  Commission
                                                              3475 Lenox Road, N.E.  Ste. 1000
                                                                Atlanta, Georgia 30326-1232
                                                                Tel: (404) 842-7616
                                                                Fax: (404) 842-7679

**Certificate of Service**

This is to certify that on November 10, 2011, I served the foregoing through the Court's CM/ECF system:

Clarence McDonald Leland, Esq.
C. M. Leland, Ltd.
P. O. Box 1466
Brandon, MS 39043-1466

This is to further certify that I have served the foregoing on the following non-CM/ECF filer by UPS Express mail courier:

Zeons Corporation
 (formerly U.S. Sustainable Energy Corp.)
123 North Post Oak Lane, Suite 400
Houston, TX 77024

                                      */s/ Alex Rue*
                                      Counsel for Plaintiff